IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOHNNY R. KOTCHAVAR, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 14-1333-KHV** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

Johnny R. Kotchavar appeals the final decision of the Commissioner of Social Security to deny disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 et seq. For reasons set forth below, the Court finds that the final decision of the Commissioner should be reversed and remanded for further proceedings.

**I.      Procedural Background**

On September 9, 2011, plaintiff filed an application with the Social Security Administration for disability insurance benefits.[1] He alleged a disability onset date of January 1, 2004 due to back pain. He also filed an application for supplemental security income. The agency denied his applications initially and on reconsideration. On November 19, 2012 and February 1, 2013, an administrative law judge ("ALJ") conducted video hearings. On February 19, 2013, the ALJ concluded that plaintiff was not under a disability as defined in the SSA and that he was not entitled to benefits. On August 8, 2014, the Appeals Council denied plaintiff's request for review. Plaintiff

---

[1]      The ALJ decision states that plaintiff filed his application under Title II on August 26, 2011. The record reflects, however, that he filed it on September 9, 2011. See Social Security Administrative Record ("SSAR") (Doc. #9) filed January 9, 2015 at 372.

appeals to this Court the final decision of the Commissioner.

**II.       Standard Of Review**

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084. Whether the Commissioner's decision is supported by substantial evidence is based on the record taken as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994). Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005). To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

**III.      Framework For Analyzing Claims Of Disability**

Plaintiff bears the burden of proving disability under the SSA. Wall, 561 F.3d at 1062. Plaintiff is under a disability if he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R.

§ 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  In the first three steps, the Commissioner determines whether (1) plaintiff has engaged in substantial gainful activity since the alleged onset, (2) he has a severe impairment or combination of impairments and (3) the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51.  If plaintiff satisfies steps one, two and three, the Commissioner will automatically find him disabled.  If plaintiff satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ must make specific factual findings regarding plaintiff's abilities in three phases.  See Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996).  First, the ALJ determines plaintiff's physical and mental residual functioning capacity ("RFC").  Id. at 1023. Second, the ALJ determines the physical and mental demands of plaintiff's past relevant work.  Id. Third, the ALJ determines whether despite the mental and/or physical limitations found in phase one, plaintiff has the ability to meet the job demands found in phase two.  Id.; Henrie v. U.S. Dep't of HHS, 13 F.3d 359, 361 (10th Cir. 1993).  If plaintiff satisfies step four, i.e. if plaintiff shows that he is not capable of performing past relevant work, the burden shifts to the Commissioner to establish that plaintiff is capable of performing other work in the national economy.  Williams, 844 F.2d at 750-51.

**IV.    Facts**

The following is a brief summary of the record.

Plaintiff was born in 1971.  He alleges that he has been unable to work since January 1, 2004, due to back pain.  Based on plaintiff's earning record, he has acquired sufficient quarters of coverage

to remain insured through September 30, 2009.  Thus the relevant period of alleged disability is from

January 1, 2004 to September 30, 2009.

      A.    <u>Medical Evidence</u>

In the summer of 2005, plaintiff sought treatment for back pain from the United States

Department of Veterans Affairs ("VA") in Wichita, Kansas.

On May 9, 2005, nurse practitioner Dianne E. Stearns examined plaintiff.  <u>SSAR</u> at 500-01.

Stearns noted that plaintiff was new to the VA and that he had no medical insurance.  <u>Id.</u> at 500.

Sterns noted that plaintiff reported the following medical history:

> Veteran relates he [had] a work related injury while working at Pepsi Cola, with
> 1500 pounds pushing veteran against a wall, [P]epsi was on a cart, floor was wet and
> according to veteran slammed veteran against a wall with a fire hydrate [sic],
> accident occurred "at least 18 years ago."  Veteran relates he has been to
> numerous/different doctors, decided surgery would not be beneficial with more risks
> than benefits for surgery.  Veteran relates his medical records have been burnt in a
> fire, had been seen at Wesely [sic] Hospital with prior scans of spine, unable to recall
> physicians names.

<u>Id.</u> at 500.  Plaintiff also reported that he had not worked in two years, his back hurt "all of the time"

and the pain radiated to his lower extremities.  <u>Id.</u> at 501.  Stearns diagnosed chronic back pain,

ordered an x-ray of the lumbar spine and prescribed Motrin 600 mg.  <u>Id.</u>

On May, 10, 2005, H. David Clifton, M.D., reviewed the x-ray of plaintiff's lumbar spine.

Dr. Clifton made the following findings:

> There is a minimal scoliosis, convexity to the right.  The pedicles are intact.  There
> is osteophyte formation throughout the thoracic spine both anteriorly and laterally.
> The sacroiliac joints are satisfactorily maintained.  There is some straightening of the
> lumbar spine in the lateral projection and there is minimal narrowing of the L4-L5
> interspace.  No acute osseous abnormality is noted.  There is no evidence of a
> fracture.

<u>Id.</u> at 487-88.

Dr. Clifton formed the following impression:

> MINIMAL SCOLIOSIS, POSSIBLY POSITIONAL, WITH HYPERTROPHIC OSTEOPHYTE FORMATION IN THE LUMBAR SPINE.     SLIGHT NARROWING OF THE L4-L5 INTERSPACE WITH NO ACUTE OSSEOUS ABNORMALITY DEMONSTRATED.

Id. at 488.

On May 17, 2005, Mahfuza Hussain, M.D., treated plaintiff for back pain and gastritis secondary to ibuprofen.  Id. at 497-98.  Dr. Hussain noted that plaintiff had a history of low back pain.  Id. at 498.  Plaintiff reported that he had injured his back about 18 years ago and since then had suffered back pain on and off.  Id.  Dr. Hussain noted that on May 9, 2005, plaintiff was started on ibuprofen but that plaintiff reported throwing up, feeling nauseous and having stomach pain.  Id. Dr. Hussain recommended that plaintiff discontinue ibuprofen and prescribed Tramadol 50 mg and an 8-week course of Ranitidine.  Id.

On June 6, 2005, plaintiff called the VA to request a magnetic resonance imaging ("MRI") of his back.  Id. at 497.  Plaintiff reported that he had tried various pain medication without relief and would like to have an MRI to find out if anything else was wrong.  Id.  The next day, the VA informed plaintiff that an MRI was not available at that facility.  Id.  Dr. Hussain ordered a CT scan for his neck and back and prescribed Tylenol #3 for pain.  Id.

On June 17, 2005, Dr. Clifton reported the results of plaintiff's CT scan.  Id. at 485-86. Regarding a CT scan of the cervical spine without contrast, Dr. Clifton made the following findings:

> The odontoid is intact.  The vertebral bodies are intact with no evidence of fracture. There is some anterior osteophyte formation in the mid and lower cervical region. There is slight narrowing of the exit foramina at C4-C5 on the left, and slight narrowing at C5-C6 on the right.  Otherwise, the foramina are all satisfactorily maintained with no stenosis.  There is no stenosis in the AP diameter of the intraspinal canal.  The soft tissue as imaged appear normal.  The airway is satisfactorily maintained. I cannot identify any disk herniation, but the cervical disk

[sic] is difficult to image on CT.

Id. at 485.  With regard to the cervical spine, Dr. Clifton formed the following impression:

> HYPERTROPHIC DEGENERATIVE CHANGES IN THE MID AND LOWER
> CERVICAL SPINE, AS DESCRIBED.  DETAILS ABOVE.  NO SIGNIFICANT
> ABNORMALITY.

Id.

Regarding a CT scan of the lumbar spine without contrast, Dr. Clifton made the following

findings:

> The interspaces at L1-L2 and L3-L4 reveals [sic] no abnormality.   There is some
> anterior osteophyte formation from L3, L4 and L5.  The exit foramina from L1
> through L3 reveals no stenosis.  There is no disc herniation and there is no stenosis
> and there is no significant facet hypertrophy.

> At L3-L4 there is slight bulging of disc annulus in the midline but this is not
> encroaching upon the exit foramina in the AP diameter and the intraspinal canal
> measures 10 mm which is near lower limits of normal.

> At L4-L5 there is moderate bulging of the disc annulus in the midline.  The
> AP diameter still measures 10 mm.  There is some facet hypertrophy.  There is no
> disc extrusion and the exit foramina appear well maintained.

> L5-S1 reveals no significant abnormality.

Id. at 486.  With regard to the lumbar spine, Dr. Clifton formed the following impression:

> CT OF THE LUMBAR SPINE WITH MODERATE BULGING OF DISC
> ANNULUS AT L3-L4.  THE AP DIAMETER OF THE INTRASPINAL CANAL
> MEASURES 10 MM.  THE EXIT FORAMINA ARE WELL MAINTAINED.
> THERE IS MODERATE BULGING OF DISC ANNULUS AT L4-L5 AND THE
> AP DIAMETER MEASURES 10MM. THE EXIT FORAMINA ARE ALSO WELL
> MAINTAINED.  THERE IS NO LOCALIZED DISC HERNIATION.  DETAILS
> ABOVE.

Id. at 486-87.

Following the CT scan, Dr. Hussain requested that plaintiff consult with Neurosurgery

regarding a provisional diagnosis of spondylosis with myelopathy, lumbar region.  Id. at 491.

-6-

On June 27, 2005, plaintiff called the VA and reported that Tylenol #3 did nothing to help his back pain. Id. at 495. Plaintiff asked whether something else for pain could be ordered. Id. The next day, the VA informed plaintiff that it had ordered Lortab for his pain. Id. at 496.

On August 3, 2005, neurosurgeon Leonard A. Klafta, M.D., examined plaintiff. Id. at 492-93. Plaintiff complained of "[p]ain in my back and both legs." Id. at 492. Dr. Klafta recorded the following patient history:

> [Patient] states that he got hurt at 18 years ago delivering Pepsi Cola to St. Francis Hospital, when cases fell on him. He was taken to Minor Emergency on the west side (because of company policy). He was given medication and sent home. He was referred to "specialists" for evaluation who arranged for an MRI and told him he didn't need surgery. They referred him to Wesley Medical for outpatient PT and rehab. He apparently also had epidural blocks without benefit. He changed occupations because of restrictions that were placed upon him, and worked until three years ago. The business was sold, and the patient has not been remployed [sic] since that time. Recently, it was suggested that he should go to the VA for evaluation, and he has subsequently been referred here. The pain in his back and the legs has remained essentially unchanged over the past 18 years. He can't sit for protracted period, but denies any other specific aggravating or relieving factors.

Id. at 492-93.

Dr. Klafta reported the following results from his neuro exam:

> The patient walks in a normal fashion, and is able to rise on heels or toes. There is a falt [sic] lumbar curve. There is no paraspinal spasm. There is localized tenderness centered at the L5-S-1 area. There is FRM of the lumbar spine. DTRs are 2+ and equal. There are no motor or sensory changes and no pathological reflexes. SLR is negative to 90 degrees bilaterally.

Id. at 493.

Regarding plaintiff's x-rays, Dr. Klafta reported the following:

> Lumbar spine films show extensive degenerative changes throughout the lumbar spine and CT shows some stenosis, predominately at L3-4 and L4-5 with associated disc bulging at these levels.

Id.

-7-

Dr. Klafta formed an impression of chronic back pain. Id. Regarding disposition, he stated as follows:

> I went over the films with the patient and his wife. I explained that he has problems that could very well account for his back pain, but that in my opinion neither discectomy, decompression or fusion alone or in combination would be likely to provide any substantial improvement in his symptoms. Since he had no relief with epidural blocks in the past, they would be unlikely to be of any benefit at this time. Essentially, I have nothing to further to [sic] offer or to suggest.

Id.

In 2011 and 2012, plaintiff sought treatment at the VA primarily for pain and numbness in his hands, carpal tunnel syndrome, and a ganglion cyst on his wrist. During this time, doctors noted that plaintiff had a history of back pain and used a walker at home. See, e.g., id. at 538 (December 14, 2011 appointment for right hand); id. at 605 (March 8, 2012 appointment for right hand).[2]

At a routine follow up on October 21, 2011, primary care resident Crystal A. Larson examined plaintiff. Id. at 627-28. Plaintiff reported the following symptoms regarding low back pain: it radiates down both legs; gets better with laying down and worse with walking; he can walk 15-20 feet before he has to stop due to pain; he can drive for short periods of time but must stop periodically to stretch his legs; the pain is constant, but is better in the morning and worse at the end of the day; he last saw neurosurgery in 2005 and was told that surgery was unlikely to provide relief; he does not take any medication and does not want any; in the past he took Lortab and it made him dizzy and did not help his pain; he cannot lift a gallon of milk due to pain in his arms, back and legs;

---

[2]    As noted, plaintiff seeks disability benefits due to back pain from January 1, 2004 to September 30, 2009. Accordingly, the Court does not go into complete detail regarding medical evidence for other conditions or complaints outside that time frame.

he has difficulty sleeping at night and cannot lay on his back due to pain.  Id. at 628.  Larson reported that plaintiff was unable to stand on tiptoes or heels and had been unable to do so for the last five years.  Id.

      B.     Plaintiff's Testimony

On November 19, 2012, plaintiff testified as follows.

He has a driver's license and is able to drive.  Id. at 193.  For the last five years, plaintiff has used a wheelchair.  Id.  The wheelchair was not prescribed for him.  Id.  His last job was at Miles Funeral Home in Winfield.  Id.  He doesn't remember the exact date when he last worked; he quit the job because the company was going up for sale and he could not get along with the secretary who worked there.  Id.  Plaintiff also worked as a glass glazer on screens and window glass.  Id. at 193.  At that job, he had to lift five to ten pounds.  Id.  Plaintiff was terminated from that job.  Id.

In September of 2009, plaintiff lived alone in an apartment in Wellington, Kansas.  Id. at 194-95.  His apartment was on the second floor and the building had an elevator.  Id. at 194.  He used to take care of his mother but she died about four years ago, i.e. in 2008.  Id. at 195.  When asked what he did for her, plaintiff stated as follows: "I didn't.  I mean I couldn't hardly do anything."  Id.  In a typical day in September of 2009, plaintiff would get up and drink coffee and not do anything but watch television.  Id. at 196.  He used a walker but not a wheelchair.  Id.  A doctor did not prescribe the walker.  Id. at 208.  Plaintiff had to use it because his legs gave out.  Id.  He could not do the laundry and housework; his mom was "kind of able enough to do that."  Id. at 196.  Plaintiff did not do the cooking or shopping and did not have hobbies or belong to any organizations.  Id. at 196-97.  His daughter helped take care of him and his mother from 2004 to 2009.  Id. at 206.  She would check on them and help with the laundry and cooking.  Id. at 206-08.

Plaintiff claimed that he could not work beginning on January 1, 2004, because that is when he got hurt at Pepsi Cola.[1]  Id. at 197.  The day he got hurt, he went to Minor Emergency.  Id. at 201. He went back to that facility two or three times for treatment.  Id.  When asked what treatment he received for his back, plaintiff stated, "[j]ust the physical therapy and stuff."  Id. at 198-99.  Plaintiff went to physical therapy for about a month when his back was hurting.  Id. at 198, 206.  The physical therapy was not between 2004 and 2009.  Id.

When asked how far he could walk between 2004 and 2009, plaintiff stated that "I got along pretty good with my walker."  Id. at 201.  He could stand for about five to ten minutes and probably lift five to ten pounds.  Id. at 201-02.

The doctors at Minor Emergency gave him restrictions.[2]  Id. at 202.  Plaintiff does not remember what the restrictions were.  Id.  The VA doctors would not give him restrictions because his injury did not happen in the military.  Id.

Plaintiff receives VA benefits based on disability caused by back injury.  Id. at 204-05.

Dr. Klafta was the last doctor that plaintiff saw for his back.  Id. at 208.  Dr. Klafta said that he could not do anything for plaintiff's back.  Id. at 208-09.  He told plaintiff to leave well enough alone.  Id. at 209.

C.      Medical Expert Opinion

Following the first hearing, the ALJ requested that medical expert Malcolm A. Brahms,

---

[1]      The Court notes that plaintiff's statements at the hearing were inconsistent with records which indicate that he sustained the injury (and worked at Pepsi Cola) some 18 years earlier.

[2]      At the first hearing, the ALJ gave counsel additional time to obtain medical records from Minor Emergency and the VA.  See SSAR at 209.  At the second hearing, the ALJ admitted additional exhibits, 20 to 21B, 12E to 14E and 6F to 10F, into the record.  See SSAR at 223.

M.D., review the medical evidence and respond to interrogatories regarding evidence of physical impairments and plaintiff's ability to do work-related activities.  See id. at 643-55.  On January 8, 2013, Dr. Brahms responded to the request.  Regarding impairments established by the evidence at the onset of January 1, 2004 through September 30, 2009, that were expected to last for a continuous period of twelve months or more, Dr. Brahms listed the following:

> Dupuytren's Contracture Bilateral
> CTS
> Low Back Pain

Id. at 662.[3]  Dr. Brahms indicated that during the time period from January 1, 2004 to September 30, 2009, plaintiff's physical impairments did not limit his ability to perform basic work-related functions.  Id. at 663.  Regarding the time period after September 30, 2009, Dr. Brahms indicated that the evidence established that plaintiff suffered from an impairment of "Residual Contracture Bilateral Hands" that lasted or could be expected to last for a continuous period of 12 months or more.[4]  Id.

Regarding ability to do physical work-related activities, Dr. Brahms opined as follows: Plaintiff could lift and/or carry 21 to 50 pounds occasionally, 11 to 20 pounds frequently and up to

---

[3]    Dr. Brahms' responses are hand-written and not entirely legible.  The Court notes that of the impairments listed by Dr. Brahms, only low back pain relates to plaintiff's claims of disability in this case.  Dupuytren's contracture is a hand deformity that usually develops over years.  See Mayo Clinic, Dupuytren's contracture, http://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/basics/definition/con-20024378 (last visited September 19, 2016).  The Court assumes that CTS stands for carpal tunnel syndrome, which is a hand and arm condition that causes numbness, tingling and other symptoms.  See Mayo Clinic, Carpal tunnel syndrome, http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/basics/definition/con-20030332 (last visited September 19, 2016).

[4]    Dr. Brahms did not respond to the question regarding whether such impairment limited plaintiff's ability to perform work-related functions during that period of time.  Id. at 664.

ten pounds continuously.[5]  Id. at 666.  Plaintiff could sit up to six hours at one time without

interruption and sit for a total of six hours in an eight-hour work day; stand for up to four hours

without interruption and for a total of four hours in an eight-hour work day; and walk for up to two

hours without interruption and up to four hours in an eight-hour work day.  Id. at 667.  Plaintiff did

not require a cane to ambulate.  Id.  Plaintiff could occasionally use his hands for fingering and

frequently use his hands for reaching, handling, feeling, pushing and/or pulling.  Id. at 668.  Plaintiff

frequently could use his feet to operate foot controls.  Id.  Plaintiff could occasionally climb ladders

or scaffolds and frequently climb stairs and ramps, balance, stoop, kneel, crouch and crawl.  Id. at

669.

> Dr. Brahms offered the following remarks:
>
> The record reveals the complaints of low back pain as well as a problem with both hands.  There is little objective evidence referable to the low back problem except a CT scan of the lumber spine dated 6/20/05 identified by 1F/3 as well as a neurological exam 8/3/05 [reported] to be within normal findings.  There is also a CT scan of the cervical spine dated 6/20/05 with no significant findings.
>
> The major information refers to problems in the hands.  Carpal tunnel surgery 9/20/12 identified (6F/4) supported with a mild positive EMG report (6F/62) dated 8/15/12 (6F/63).  The major finding of Dupytrens contracture was treated surgically 9/20/12 as well as March 2012 because a recurrent nodule a revision surgery 5/23/12.  There remains evidence of some residule [sic] contracture (6F/75).  Grip strength is not of common concern/however fine manipulation may be altered.
>
> It is determined he is capable of LIGHT activity, accordingly he does not meet or equal S.S.

Id. at 672 (emphasis in original).

---

[5]      The form defines "frequently" to mean from one-third to two-thirds of the time and "occasionally" to mean very little to one-third of the time.  SSAR at 666.

D.      Vocational Expert Testimony

On February 1, 2013, the ALJ held a second hearing to question a vocational expert regarding the medical expert assessment.[6] Id. at 222.  The ALJ asked the vocational expert about a hypothetical individual who is 49 to 55 years old; has a 12th-grade education; can lift and carry 50 pounds occasionally and 25 pounds frequently; sit for six of eight hours, stand for four of eight hours and walk for four of eight hours, with the walking limited to two hours at a time; occasionally climb ladders and scaffolds and frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and frequently use the feet bilaterally to operate foot controls.  Id. at 226-27.  The vocational expert testified that an individual with such limitations would be able to perform plaintiff's past relevant work and also perform medium, unskilled work that exists in significant numbers in the national economy, including a cleaner, dish washer and hand packer.  See id. at 227-29.  When asked to consider a hypothetical individual who was further limited in the use of his hands such that he could occasionally finger and frequently reach, handle, feel, push and pull, the vocational expert testified that it would impact his ability to perform past work as a glass installer but that he would retain the ability to perform all other jobs.  Id. at 229-30.

---

[6]      At the initial hearing on November 19, 2012, the ALJ heard testimony from another vocational expert.  See SSAR at 210-18.  The ALJ asked the vocational expert about a hypothetical individual who had an exertional level of medium and could lift and carry 50 pounds occasionally and 25 pounds frequently; sit for six of eight hours, stand for six of eight hours; never climb ladders and scaffolds and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  Id. at 212-14.  The vocational expert testified that an individual with such limitations could not perform plaintiff's past relevant work.  Id. at 214.  The vocational expert testified that such an individual could perform work that exists in significant numbers in the national economy, including a laundry laborer, hand packager, lumber sorter and garment sorter.  Id. at 215.

## V.    ALJ Findings

The ALJ denied benefits at step four, finding that plaintiff is capable of performing past relevant work. Id. at 182-83. Alternatively, the ALJ found under step five that plaintiff is capable of performing work in the national economy. Id. at 183. In so doing, the ALJ found that plaintiff suffered from medically determinable impairments that could reasonably be expected to cause some of his alleged symptoms. Id. at 180. The ALJ determined, however, that plaintiff's credibility was "fair" regarding his statements about the intensity, persistence and limiting effects of the alleged symptoms. Id. Based primarily on the report of Dr. Brahms, a medical expert who reviewed records and did not examine plaintiff, the ALJ determined that plaintiff was capable of "medium" exertional work. Id. at 181. Specifically, the ALJ found that plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently; sit for six of eight hours, stand for four of eight hours and walk for four of eight hours and up to two hours at a time; occasionally climb ladders and scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and use his feet bilaterally at least frequently for operation of foot controls. See id. at 177, 180-81.

The ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2004 through his date last insured of September 30, 2009 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairment: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c)). * * *

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). * * *

-14-

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant could lift/carry fifty pounds occasionally and twenty-five pounds frequently; sit six of eight hours; stand four of eight hours; and walk four of eight hours, up to two hours at a time. He could occasionally climb ladders and scaffolds. He could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He could use his feet bilaterally at least frequently for operation of foot controls. * * *

6. Through the date last insured, the claimant was capable of performing past relevant work as an installer of panes of glass, general worker for mortuary, spray painter, construction dump truck driver, and sales route driver. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). * * *

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2004, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(f)).

Id. at 174-85 (emphasis omitted).

## VI.    Analysis

As noted, the ALJ determined that plaintiff was capable of "medium" exertional work based primarily on a report by Dr. Brahms, a medical expert who reviewed the records and did not examine plaintiff. SSAR at 181. Plaintiff asserts the RFC determination is not supported by substantial evidence because the ALJ erroneously discounted plaintiff's credibility and failed to consider the VA determination that he is disabled. The Court finds the latter issue dispositive and therefore addresses it first.

### A.    VA Disability Determination

Plaintiff asserts that the ALJ erred in not considering the VA determination that he is disabled. As noted, plaintiff testified that he received VA benefits based on disability caused by his back injury. Id. at 204-05. The ALJ noted that plaintiff is "disabled by the VA due to his back

injury" and that he receives VA benefits of $1,021.[7] Id. at 178.  The ALJ found, however, that the VA determination was based on different rules and/or standards than social security law and is therefore not binding on the Social Security Administration.  Id. at 181.  The ALJ apparently did not consider the VA disability determination or give it any weight.  See SSAR at 181.[8]

Disability findings by other agencies are not binding on the Commissioner but they are entitled to weight and must be considered.  See Baca v. Dep't of HHS, 5 F.3d 476, 480 (10th Cir. 1993) (quoting Fowler v. Califano, 596 F.2d 600, 604 (3d Cir. 1979).[9]  Although the Tenth Circuit has not articulated what evidentiary weight an ALJ should give another agency's disability findings, it is "beyond dispute" that the ALJ must consider such findings and give them some weight.  Richter v. Chater, 900 F. Supp. 1531, 1539 (D. Kan. 1995).  A passing reference to another agency's disability finding or a perfunctory rejection of it will not suffice.  Id. at 1539.  Rather, the ALJ must consider the disability determination in her evaluation of the evidence and explain what weight she gave this "important fact."  Id. at 1539 (quoting Thomas v. Weinberger, 398 F. Supp. 1034, 1036 (D. Kan. 1975)); see also Grogan, 399 F.3d at 1262-63 (ALJ must consider VA disability determination and explain why he did not find it persuasive); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *6-7 (August 9, 2006) (disability determination by another agency cannot be ignored and must be considered; ALJ should explain consideration given to such decision).

---

[7]     The record does not reflect how often plaintiff receives VA benefits.

[8]     The ALJ made similar findings with respect to the settlement of plaintiff's workers' compensation claim.  See SSAR at 181.  Plaintiff does not challenge those findings.

[9]     In Fowler, the Third Circuit noted that it had previously found that a disability evaluation by the Veterans Administration was "critically relevant and material" in a parallel Social Security proceeding.  Fowler, 596 F.2d at 604 (citations omitted).

Here, the ALJ apparently gave no consideration or weight to the VA disability determination; rather, she merely noted that a different standard applied and found that the determination was not binding on the Commissioner.  See SSAR at 181.  The ALJ's failure to consider the VA disability determination and explain what weight she gave it constitutes reversible error.  See Grogan, 399 F.3d at 1263; Hoog v. Colvin, No. 15-9123-SAC, 2016 WL 4593479, at *3 (D. Kan. September 2, 2016) (failure to consider VA disability rating not harmless error); Burroughs v. Astrue, 487 F. Supp.2d 1258, 1265 (D. Kan. 2007); Richter, 900 F. Supp. at 1539.

The Commissioner asserts that the VA award letter provides no information on plaintiff's impairments or the reason for the pension payments and therefore does not constitute persuasive evidence of a disability.  See Brief Of The Commissioner (Doc. #20) filed August 28, 2015 at 8 n.6. The Court may not create post-hoc rationalizations to explain the ALJ's treatment of the VA disability determination when that treatment is not apparent from the decision itself.  See Grogan, 399 F.3d at 1263.  Moreover, the ALJ has a duty to develop the record in this regard. See, e.g., Zeverly v. Barnhart, No. 03-7058, 94 Fed. App'x 722, 724 (10th Cir. April 2, 2004) (ALJ breached duty to develop administrative record by failing to obtain and consider evidence associated with disability ratings that plaintiff received from VA); Richter, 900 F. Supp. at 1539 (Commissioner must make every reasonable effort to obtain records from VA).  On remand, the Commissioner shall obtain and address findings by the VA with respect to any disability ratings received by plaintiff and determine the effect, if any, that the findings have on plaintiff's application for social security disability benefits.  See Zeverly, 94 Fed. App'x at 724; Burroughs, 487 F. Supp.2d at 1266-67.  The Court expresses no opinion regarding whether any disability findings by the VA should change the result in this case.

### B.      Credibility Determination

Plaintiff asserts that the ALJ erroneously discounted his credibility based on a selective and misleading review of the evidence.  See Plaintiff's Brief (Doc. #16) filed July 1, 2015 at 4-9.  In reviewing ALJ credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).  Credibility is the province of the ALJ.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1499 (10th Cir. 1992).  At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible.  See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)).  So long as the ALJ sets forth the specific evidence on which she relies in evaluating claimant's credibility, the ALJ is not required to conduct a formalistic factor-by-factor recitation of the evidence.  White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001); see Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  In making a finding about credibility, the ALJ need not totally accept or totally reject the individual's statements.  See SSR 96-7p, 61 Fed. Reg. 34483, 34486 (July 2, 1996).  Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." See id.

The Tenth Circuit has set forth the proper framework for analyzing evidence of subjective symptoms such as back pain.  See Thompson, 987 F.2d at 1488.  The relevant factors are whether (1) claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) a loose nexus exists between the impairment and the subjective condition; and (3) the

subjective condition is disabling based upon all objective and subjective evidence.  See Glass v.

Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir.

1987).

As noted, the ALJ found that plaintiff suffered from degenerative disc disease of the lumbar

spine which could reasonably be expected to produce his alleged symptoms, i.e. back pain.  See

SSAR at 177-180.  In light of these findings, the ALJ was required to consider whether the back pain

was disabling based upon all objective and subjective evidence.  See Sitsler v. Astrue, No. 10-5033,

410 Fed. Appx. 112, 117 (10th Cir. Jan. 10, 2011); Luna, 834 F.2d at 164-65.  In making this

determination, the ALJ should consider the following factors:

> the levels of medication and their effectiveness, the extensiveness of the attempts
> (medical or nonmedical) to obtain relief, the frequency of medical contacts, the
> nature of daily activities, subjective measures of credibility that are peculiarly within
> the judgment of the ALJ, the motivation of and relationship between the claimant
> and other witnesses, and the consistency or compatibility of nonmedical testimony
> with objective medical evidence.

Huston, 838 F.2d at 1132.

Here, the ALJ found that as to statements concerning the intensity, persistence and limiting

effects of his back pain, plaintiff's credibility was "fair."  SSAR at 180.  Specifically, the ALJ found

as follows:

> During the relevant period, the claimant had some back pain for eighteen years.
> However, it was not work precluding. No surgery or epidural blocks were
> recommended (Exhibit B1F, p.12). The claimant testified his treatment consisted of
> physical therapy. As mentioned previously, a treatment note dated October 21, 2011
> indicates that he did not take any medication for his back pain, and he did not want
> any. In the past, he took Lortab and it made him dizzy, and it did not help his pain.
> The claimant declined pain medication for his back pain (Exhibit B6F, pp.115-116).
> The record indicates conservative treatment for his condition. He did not file for
> these benefits until over five years after the alleged onset of disability, and over two
> years after his insured status expired.  Such information, is some evidence, though
> not dispositive, that the claimant's impairment(s) did not preclude working.  The

claimant testified he was caring for his mother, to his credit. The claimant stated that he netted $30,000 from his workers' compensation settlement. The overall record does not corroborate the claimant's complaints to the extent alleged during the relevant period.  He had a wheelchair at the hearing, and stated that he has used it for five years.  He also stated that he uses a walker from the VA.  However, the overall record does not support a necessity for assistive devices during the relevant period.

Id. at 180-81.

On this record, it appears that the ALJ's credibility findings are not closely and affirmatively linked to substantial evidence.  See Kepler, 68 F.3d at 391 (ALJ must explain why specific evidence relevant to each factor supports conclusion that subjective complaints are not credible).  The ALJ correctly noted that plaintiff sustained his back injury more than 18 years ago (before he claimed he was disabled) and that the back injury did not preclude him from working during that period of time.  The ALJ cited other factors, however, which do not necessarily support a finding that plaintiff's subjective complaints of pain were not credible.  For instance, the physical therapy which plaintiff received was 18 years earlier, when the accident first occurred; it was not during the alleged period of disability, i.e. between 2004 and 2009.  Id.  It is not clear why the fact that doctors did not recommend surgery or epidural blocks would detract from plaintiff's credibility.  In August of 2005, Dr. Klafta found that plaintiff had problems that could very well account for his back pain, but that Dr. Klafta could not suggest anything that would likely provide any substantial improvement in his symptoms.  See id. at 493.  The ALJ noted that in 2011 (after the relevant period of disability), plaintiff declined medication for back pain.  The ALJ, however, did not discuss the fact that during the period of alleged disability, in 2005, plaintiff tried numerous pain medications which either caused negative side effects or offered no relief.  See SSAR at 498 (plaintiff was started on ibuprofen but reported throwing up, feeling nauseous and having stomach pain; Dr. Hussain discontinued ibuprofen and prescribed Tramadol), 497 (plaintiff asked for MRI, reporting that he

had tried various pain medication without relief; Dr. Hussain prescribed Tylenol #3 for pain), 495 (plaintiff reported that Tylenol #3 did nothing to help his pain and asked for something else; VA ordered Lortab for pain); 493 (since epidural blocks did not help in past, would be unlikely to benefit at this time).   These facts militate against the ALJ finding that plaintiff's failure to take pain medication negatively affected his credibility.  See, e.g., Cameron v. Halter, No. 00-7092, 6 F. App'x 823, 825 (10th Cir. April 12, 2001) (ALJ erred by not addressing type, dosage, effectiveness, and side-effects of medications prescribed over the years).  The ALJ cited the fact that plaintiff waited five years to file for social security benefits; however, this fact standing alone does not seem to relate one way or another to the credibility of plaintiff's complaints of pain.  The ALJ found that plaintiff cared for his mother; however, this fact appears to be taken out of context.  Plaintiff testified that he took care of his mother, but she died in 2008.  Id. at 195.  When asked what he did for her, plaintiff stated,  "I didn't.  I mean I couldn't hardly do anything."  Id.  Plaintiff testified that he did not do the laundry or housework, his mom was "kind of able" to do that, and his daughter helped take care of him and his mother from 2004 to 2009.  Id. at 196, 206.

The ALJ found that plaintiff's credibility was "only fair" and "less than full."  SSAR at 180, 182.  The ALJ did not indicate whether she found some or none of his statements credible.  See SSR 96-7p.  Plaintiff testified that during the relevant period, he could walk with his walker "pretty good," stand for five to ten minutes and probably lift five to ten pounds.  Id. at 201-02.  The ALJ found that plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently; sit for six of eight hours, stand for four of eight hours and walk for four of eight hours and up to two hours at a time.

The ALJ gave "great weight" to an assessment by Dr. Brahms, who answered interrogatories

and did not examine or treat plaintiff.  <u>Id.</u> at 182.  Dr. Brahms' assessment, however, contained

numerous inconsistencies and contradictions with the record.  For instance, Dr. Brahms found that

during the relevant period of alleged disability, <u>i.e.</u> from January 1, 2004 to September 30, 2009, the

medical evidence established that plaintiff suffered from three impairments that were expected to

last for a continuous period of 12 months or more: Dupuytren's contracture, CTS (carpal tunnel

syndrome) and low back pain.[10]  <u>Id.</u> at 662, Interrogatory No 1.  In fact, plaintiff developed

Dupuytren's contracture and CTS after the period of alleged disability.  Interrogatory No. 4 asked

Dr. Brahms to complete Form SSA-1151 if any of the impairments which he listed in

Interrogatory No 1 caused limitations on plaintiff's ability to perform basic work-related functions

from January 1, 2004 to September 30, 2009, <u>i.e.</u> during the alleged period of disability, and to

indicate for what period of time this occurred.  <u>Id.</u> at 663.  Dr. Brahms responded "no."  <u>Id.</u>

Interrogatory No. 5 asked whether from September 30, 2009 to the present plaintiff suffered from

impairments that were expected to last for a continuous period of 12 months or more.  <u>Id.</u>

Dr. Brahms responded "yes" and indicated "Residule [sic] Contracture Bilateral Hands."[11]  <u>Id.</u>

Interrogatory No. 8 asked Dr. Brahms to complete Form SSA-1151 if the impairments which he

listed in Interrogatory No. 8 caused limitations on plaintiff's ability to perform basic work-related

functions after September 30, 2009, <u>i.e.</u> after the alleged period of disability, and to indicate for what

period of time this occurred.  <u>Id.</u> at 664.  For Interrogatory No. 8, Dr. Brahms left the answer blank.

---

[10]     Although the interrogatory asked Dr. Brahm to cite objective medical findings that support his opinion with specific references to evidence provided from the case record, he did not do so.  <u>SSAR</u> at 662.

[11]     Although the interrogatory asked Dr. Brahm to cite objective medical findings that support his opinion with specific references to evidence provided from the case record, he did not do so.  <u>SSAR</u> at 662.

Dr. Brahms completed the Form SSA-1151 regarding plaintiff's ability to perform work-related activities (physical), but he did not indicate the time frame for the assessment, i.e. whether it applied to Interrogatory No. 4 regarding the alleged period of disability or Interrogatory No. 8 regarding the time after the alleged period of disability.[12]  See id. at 666-71.  The ALJ noted that Dr. Brahms' findings in the functional capacity assessment, i.e. on Form SSA-1151, were consistent with "medium" exertional work.  See id. at 182.  In a separate typed note, however, Dr. Brahms determined that plaintiff was capable of "light" activity.  Id. at 672.  The ALJ noted this inconsistency and speculated that "to the extent that light may be due to hand issues, that was not shown in the relevant period."  Id. at 182.  In light of the inconsistencies in Dr. Brahms' assessment and the ALJ's failure to evaluate plaintiff's credibility based on relevant factors and to make findings that are closely and affirmatively linked to substantial evidence, the Court remands the case for further proceedings.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's decision and **REMANDING** for further proceedings in accordance with this memorandum and order.

Dated this 3rd day of October, 2016 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[12]    As noted, Dr. Brahms answered "no" to Interrogatory No. 4 and did not respond to Interrogatory No. 8.